IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

UNITED STATES OF AMERICA,      .
                               .
                               .
     vs.                       . DOCKET NO. 5:22-CR-366-OLG-1
                               .
HOMERO ZAMORANO, JR.,          .
                               .
          DEFENDANT.           .

TRANSCRIPT OF REARRAIGNMENT PROCEEDINGS
BEFORE THE HONORABLE ORLANDO GARCIA
UNITED STATES DISTRICT JUDGE
JANUARY 16, 2025

APPEARANCES:
FOR THE PLAINTIFF:      ERIC FUCHS, ESQUIRE
                        SARAH ELLA SPEARS, ESQUIRE
                        UNITED STATES ATTORNEY'S OFFICE
                        601 N.W. LOOP 410, SUITE 600
                        SAN ANTONIO TX 78216


FOR THE DEFENDANT:      JOSE I. GONZALEZ-FALLA, ESQUIRE
                        FEDERAL PUBLIC DEFENDER'S OFFICE
                        LAVACA PLAZA
                        504 LAVACA STREET, SUITE 960
                        AUSTIN TX 78701



                        MARK STEVENS, ESQUIRE
                        ATTORNEY AT LAW
                        310 S. ST. MARY'S STREET, #1920
                        SAN ANTONIO TX 78205

ALEJANDRO RAFAEL ALMANZAN, ESQUIRE
FEDERAL PUBLIC DEFENDER
300 CONVENT STREET, SUITE 2300
SAN ANTONIO TX 78205


REPORTED BY:          GIGI SIMCOX, RMR, CRR
COURT REPORTER
SAN ANTONIO, TEXAS

# I N D E X

HOMERO ZAMORANO
Examination By The Court                                    6
Examination By The Court Continued               26

*(San Antonio, Texas; January 16, 2025, at 10:00 a.m., in open court.)*

THE COURT: Let's proceed with U.S. versus Homero Zamorano, Cause Number 22CR366.

MR. FUCHS: Good morning, Your Honor. Eric Fuchs and Sarah Spears here for the United States.

THE COURT: Okay.

MR. GONZALEZ-FALLA: And Your Honor, good morning. Jose Gonzalez-Falla, Mark Stevens, and Alex Almanzan for Mr. Zamorano.

THE COURT: Okay. If you and your client could come over to the podium, please.

Let me ask the defendant. The Court understands that you wish to plead guilty to Counts 1, 2, and 3 of the indictment, is this correct?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. Counsel, how long have you represented the defendant, and on how many occasions have you had an opportunity to talk to your client and discuss his case?

MR. GONZALEZ-FALLA: Your Honor, I've been representing Mr. Zamorano since he was arrested back in June of 2022 and I have seen him frequently. I don't know that I could -- I would say probably at least 20 times.

THE COURT: Twenty times. Okay. Counselor, do you

have any doubt as to defendant's competence to enter a plea at this time?

MR. GONZALEZ-FALLA: No.

THE COURT: Do you believe he has both a factual as well as a rational --

THE DEPUTY CLERK: The oath.

THE COURT: Oh, the oath.

MR. GONZALEZ-FALLA: You have to take an oath. Raise your right hand.

(HOMERO ZAMORANO, having been duly sworn, testified as follows:)

THE COURT: Okay. Let me ask again.

Counselor, how long have you represented the defendant and how many occasions have you had an opportunity to talk to him? You tell me you have represented him since June 2022 --

MR. GONZALEZ-FALLA: That's correct.

THE COURT: -- and you have talked to him at least 20 times during that time?

MR. GONZALEZ-FALLA: That's correct, Judge.

THE COURT: Okay. And do you believe, Counselor, he has both a factual as well as a rational understanding of the proceedings?

MR. GONZALEZ-FALLA: Yes, Your Honor.

THE COURT: And does he have sufficient present

ability to consult with you within a reasonable degree of rational understanding?

MR. GONZALEZ-FALLA:  He does, Your Honor.

THE COURT:  Let me ask the defendant.

EXAMINATION

BY THE COURT:

Q.  Have you ever suffered, or do you suffer now from any mental or physical impairment which could have -- which could affect your ability to understand the charges against you?

A.  No, sir.

Q.  What I'm asking is:  Have you -- do you suffer now from any medical condition or anything that prevents you or precludes you from understanding --

A.  No, sir.

Q.  -- the proceedings?

A.  No.

Q.  Okay.  So you understand the charges?

A.  Yes, sir.  Yes, sir.

Q.  All right.  Let me ask you.  Are you presently under the influence of any alcohol, drug, medication that could or does interfere with your understanding of the proceedings today?

A.  No, sir.

Q.  Okay.  So you are fully understanding what's going on here today?

A.  Yes, sir.

Q.  Does your willingness to plead guilty result from prior discussions between your attorney, the attorney from the government, and you?

A.  Yes, sir.

Q.  Okay.  And you have been involved in those discussions?

A.  Yes, sir.

Q.  Okay.

THE COURT:  And is there a plea agreement in this case?

MR. FUCHS:  There is not, Your Honor.

THE COURT:  Okay.  So defendant is pleading to the indictment, is that correct?

MR. FUCHS:  Yes, Your Honor.  And to be clear, it's the third superseding indictment.

THE COURT:  All right.

BY THE COURT:

Q.  You are charged by a three-count indictment.  Count 1 charges you with conspiracy to transport aliens resulting in death, causing serious bodily injury, and placing lives in jeopardy, in violation of 8 U.S. Code, Section 1324 (a)(1)(A)(ii), (a)(1)(A)(B)(i), and (a)(1)(B)(iv).

Count 2 charges you with transportation of aliens resulting in death, in violation of 8 U.S. Code, Section 1324 (a)(1)(A)(ii), (a)(1)(A)(v)(II), and (a)(1)(B)(iv).

And Count 3 charges you with transportation of aliens

causing serious bodily injury and placing lives in jeopardy, in violation of 8 U.S. Code, Section 1324 (a)(1)(A)(ii), (a)(1)(A)(v)(II), and (a)(1)(B)(iii).

Do you understand that you have the right to plead not guilty to these charges?

A. Yes, sir.

Q. Okay. Knowing this, how do you plead, guilty or not guilty, to the charges just named?

A. *(Inaudible.)*

REPORTER: I'm sorry. I didn't hear your answer.

THE DEFENDANT: Guilty.

MR. GONZALEZ-FALLA: Judge, I've got the second superseding indictment, but the only change is a typographical error. I just wanted to let my client know that because --

THE COURT: All right. Does your client know about the difference?

MR. GONZALEZ-FALLA: Yes, Your Honor.

THE COURT: Okay.

BY THE COURT:

Q. All right. Now, before accepting your plea, there are a number of rights I need to advise you of. There will also be a number of questions I will ask of you. If you do not understand these rights or questions, or anytime wish to consult with your attorney, please let me know.

So if at any time I say something, if I'm speaking too

fast, which sometimes is the occasion, if there's something you don't understand or you need a pause, just tell me. I'll let you come forward with your lawyer. We are not in any rush. I want to make sure you understand everything that is occurring here today.

A. Yes, sir.

Q. This is your case. It affects you. So if at any point you want to say, Judge, can you slow down a minute, or I need to talk to my lawyer, you understand that, right?

A. Yes, sir.

Q. And you'll tell me that?

A. Yes, sir.

Q. And you know we're not under any rush?

A. Yes, sir.

Q. Okay. And we're not. Okay. I clearly need you to understand what's going on.

A. Yes, sir.

Q. Have you had enough time to fully discuss your case and possible defenses that you may have to the charges with your lawyer? In other words, have you had sufficient time, you believe, to discuss this case, possible defenses with your lawyer?

A. Yes, sir.

Q. Okay. Are you satisfied with your lawyer's representation of you?

A. Yes, sir.

Q. Okay. Have you received a copy of the indictment stating the charges against you?

A. Yes, sir.

Q. Okay. And have you read it or had it read to you?

A. Yes, sir.

Q. Okay. And have you discussed with your attorney the charges in the indictment to which you intend to plead guilty to?

A. Yes, sir.

Q. Okay.

THE COURT: I'll now ask the Assistant U.S. Attorney to read the charge in the indictment to which you are pleading to.

Unless, Defense Counsel, you wish to waive them?

MR. GONZALEZ-FALLA: We will, Your Honor. I've gone over this indictment with my client.

BY THE COURT:

Q. What that means is government's lawyer is not going to recite the entire indictment. Is that okay with you?

A. Yes, sir.

Q. You've reviewed them, read the indictment?

A. Yes, sir.

Q. All right. Now, do you understand the charges in the indictment?

A.   Yes, sir.  I do.

Q.   Do you have any questions concerning the charges in the indictment?

A.   No, sir.

Q.   Are you aware of the notice of the government's demand for forfeiture contained in the indictment?

     *(Off-the-record discussion)*

A.   Yes, sir.

Q.   Okay.  Are you aware of the items the government seeks to forfeit in this case?

A.   Yes, sir.

Q.   Okay.  Now, as to Counts 1, 2, 3 of the indictment, which charge you with conspiracy to transport aliens, transportation of aliens resulting in death, causing bodily injury, and placing lives in jeopardy, is that what you did and is that what you are pleading guilty to?

A.   Yes, sir.

Q.   Okay.  And you understand that under the Constitution and laws of the United States you are entitled to a trial by jury on the charges -- on these charges?

A.   *(Nodding head)*.

Q.   You understand you have the right to a jury trial, if you wish?

A.   Yes, sir.

Q.   Okay.  Now, if you elect to go to a trial before a jury,

you would have the right to challenge the composition and make-up of the jury panel out of which a jury would be selected to hear your case. Do you understand this right?

A. Yes, sir.

Q. Further, do you understand that at trial and any stage of the proceedings against you, you have the right to assistance of counsel?

A. Yes, sir.

Q. Do you understand that you are presumed to be innocent and the government is required to prove your guilt beyond -- rather, by competent evidence beyond a reasonable doubt before you could be found guilty, and that you do not have to prove that you were innocent? Do you understand this?

A. Yes, sir.

Q. In other words, it's up to the government to prove the case against you.

A. Yes, sir.

Q. It's not your burden to prove you are innocent. Do you understand that?

A. Yes, sir.

Q. Okay. Do you understand that in the course of trial witnesses for the government would have to come to court and testify in your presence and your counsel could cross-examine the witnesses for the government, object to evidence offered by the government, and offer evidence on your behalf? Do you

understand that?

A. Yes, sir.

Q. Okay. Do you further understand that at a trial, although you would have the right to testify, if you chose to do so, you also have the right not to testify, and no inference or suggestion of guilt could be drawn from the fact that you did not testify; in other words, cannot be held against you?

A. Yes, sir.

Q. What this means is if you wanted to, you could testify in your own case. You are not required to do so. And if you are not -- if you do not testify, cannot hold that against you, if you don't testify --

A. Yes, sir.

Q. -- if you chose to testify.

Okay. Additionally, do you understand that while you're not required to do so and could not be compelled to do so, you have the right at trial to call witnesses on your own behalf and present evidence?

A. Yes, sir.

Q. If you plead guilty and I accept your plea, you will waive, in other words, give up your right to a trial and the other rights I just discussed, except your right to be represented by a lawyer. By pleading guilty, you convict yourself by own admission of guilt. There will be no trial. I'll enter a judgment of guilty and sentence you on the basis

of your guilty plea. Do you understand what I've just explained?

A. Yes, sir.

Q. Do you understand that if you plead guilty I may ask you some questions about the offense to which you are pleading and you'll no longer have the right to remain silent about those charges?

A. Yes, sir.

Q. Do you understand further that if you answer the questions under oath on the record in the presence of your lawyer, your answers may later be used against you in a prosecution for perjury or false statements, if your answers were untrue. Do you understand this?

A. Yes, sir.

Q. Okay. Are you pleading guilty because you, in fact, are guilty, and for no other reason?

    *(Off-the-record discussion)*

A. Yes, sir.

Q. Okay. I will impose the sentence after considering the advisory guidelines established by the U.S. Sentencing Commission. The range of punishment will be determined considering such things as the nature and circumstances of the offense, your conduct in the case, and your past criminal history. Do you understand this?

A. Yes, sir.

Q.  Do you understand the maximum possible penalty for conspiracy to transport and transportation of aliens resulting in death in Counts 1 and 2 of the indictment is life imprisonment?

A.  Yes, sir.

Q.  Okay.  Do you understand that the maximum possible penalty for transportation of aliens causing bodily injury and placing lives in jeopardy in Count 3 of the indictment is 20 years' imprisonment?

A.  Yes, sir.

Q.  There's no longer any possibility of parole in the federal court system.  The sentence you receive will be the time you will serve, less credit for good time.  Do you understand this?

A.  Yes, sir.

Q.  Okay.  Do you understand that you may be required to pay the cost of incarceration, if you are incarcerated, and the cost of supervision, if you are given supervised release?

A.  Yes, sir.

Q.  Okay.  Supervised release is a term of supervision which you must serve after completing your initial term of confinement.  For the type of offenses to which you are pleading guilty, there is a maximum term of five-year supervised release, in addition to any other imprisonment.  Do you understand this?

A.   Yes, sir.

Q.   Okay.   Supervised release begins to run at the termination of your imprisonment.   The imposition of supervised release is made optional, only if imprisonment of one year or less is imposed.   And while on supervised release, you will be required to comply with various conditions.

Failure to comply with these conditions could result in revocation of your supervised release.   If the supervised release is revoked for any violation for its terms, you may be required to serve an additional term of confinement equal to the term of supervised release to which you are sentenced.   Do you understand this?

A.   Yes, sir.

Q.   Okay.   The term of imprisonment can be as long as the original term of supervised release, even if the violation and revocation occur at the end of your supervised release term. For example, if you receive a one-year term of supervised release and at the end of that year or near the end of that term of supervised release you violate a term of condition, you may be sentenced to serve up to a year in prison.   Do you understand that?

A.   Yes, sir.

Q.   Okay.   In addition, I can, after revocation of a term of supervised release, include in the new sentence a period of incarceration followed by a new term of supervised release, as

long as the sum of the incarceration and the supervised release term does not exceed the original supervised release term.  Do you understand this?

A.  Yes, sir.

Q.  Okay.  Do you understand then supervised release and the consequences it has on the amount of time you may have to serve?

A.  Yes, sir.

Q.  You are further advised that the Court's required to assess a one-time monetary assessment of $100.  The assessment is mandatory.  Do you understand this?

A.  Yes, sir.

Q.  Okay.  Further, has anyone made any prediction, promise, prophecy to you as to what your sentence will be?

A.  No, sir.

Q.  Okay.

THE COURT:  What, in summary -- I'll ask the government.  What, in summary, would the government's evidence as to the charges to which defendant is pleading guilty?

MR. GONZALEZ-FALLA:  And, Judge, what we do agree to is everything that's in this indictment, we admit, and we would ask that the government's summary adhere to the indictment.  I know there are some extraneous acts that are involved, but we're remaining silent as to those extraneous acts.

THE COURT: Are you asking the prosecutor not give me a summary?

MR. GONZALEZ-FALLA: No. I'm just saying to not discuss extraneous facts that are not in the indictment. That's all. There was a proposed factual basis that included a lot of other information that we're remaining silent on.

THE COURT: Is that acceptable to you, Counselor?

MR. FUCHS: Well, no, Judge. I intend to read a factual basis that we could prove, beyond a reasonable doubt. If he intends to acquiesce to that, that's his decision.

MR. GONZALEZ-FALLA: And we agree to all the facts that are in this indictment. Whatever extra he wants to say, that's fine. We're going to remain silent on that fact.

THE COURT: Okay. Go ahead.

MR. FUCHS: And, Judge --

THE COURT: What, in summary, then would be the evidence in this case?

MR. FUCHS: And before I get to that, I did not hear you discuss the maximum fine in this case, and I just want to make sure that we --

THE COURT: What is the maximum fine?

MR. FUCHS: On each count, it's just the $250,000.

THE COURT: On each count?

MR. FUCHS: Yes.

BY THE COURT:

Q.   Okay.  Do you understand the maximum fine is $50,000 per count?

MR. FUCHS:  I'm sorry.  $250,000.

BY THE COURT:

Q.   $250,000.  Do you understand that's the maximum fine?

A.   Yes, sir.

Q.   Okay.

THE COURT:  All right.  Go ahead, Counselor.

MR. FUCHS:  Yes, Judge.  United States can prove the following facts beyond a reasonable doubt --

THE COURT:  Counselor, you and your client can go ahead and take a seat.

MR. GONZALEZ-FALLA:  Thank you.

THE COURT:  If you'll come up here to the podium.

MR. FUCHS:  Your Honor, the United States is prepared to prove the following facts beyond a reasonable doubt at trial:  That on June 27th of 2022, law enforcement responded to the scene of a human smuggling event involving a tractor-trailer on Quintana Road in San Antonio, which is within the Western District of Texas.

There, responding officers located 48 deceased individuals inside or within the vicinity of the tractor-trailer.  Sixteen additional individuals were rushed to local hospitals for medical evaluation.  Five died at the

hospital, bringing the total to 53 deceased.

Twenty-six of those were Mexican nationals, 21 were Guatemalan nationals, and six were Honduran nationals.

THE COURT: Twenty-one were what?

MR. FUCHS: Guatemalan.

THE COURT: Oh, okay.

MR. FUCHS: All 64 were determined to have been illegally present in the United States by Immigration authorities.

The medical examiner determined that the 53 aliens who died did so as a result of hypothermia, many with an asphyxial component.

THE COURT: Okay. How many died?

MR. FUCHS: Fifty-three.

THE COURT: Fifty-three. Go ahead.

MR. FUCHS: Officers found Homero Zamorano, the defendant, unconscious in the nearby brush along Quintana Road. Witnesses at the scene identified him as the driver of the tractor-trailer. Subsequent investigation revealed that Zamorano had been recruited into the human smuggling organization to drive tractor-trailer loads of aliens from Laredo to San Antonio, which he did on four occasions in 2022: On May 12th; May 20th; May 31st; and ultimately on that June 27th day.

Zamorano's cell phone location data and Border Patrol

checkpoint license plate readers confirmed these trips.

On each of the dates Mr. Zamorano drove for the organization, Zamorano was transported by a coconspirator to a gas station in San Antonio where he took control of an empty tractor-trailer provided by another coconspirator.

Mr. Zamorano would then drive the empty tractor-trailer to Laredo where aliens were loaded into the trailer.  Each time the trailers were locked from the outside after the aliens were loaded and the aliens were unable to get out of the trailer on their own from the inside.

On May 12th, 20th, and May 31st, Mr. Zamorano successfully transported the aliens from Laredo to San Antonio where they were unloaded from his trailer into waiting passenger vehicles for further transport.

Then, on June 27th, Mr. Zamorano was provided the 2008 Volvo semi-truck -- I'm going to read the VIN, just for forfeiture purposes.  That's VIN 4V4NC9eJ58N265065, and that semi-truck pulled a 1995 Phoenix ultra-refrigerated trailer, which again had -- that VIN Number was 1UYVS2530SU244808, both of which are referenced in the forfeiture counts of this indictment, which Mr. Zamorano then drove to Laredo to transport aliens to San Antonio as he had done previously.

In Laredo, at least 64 aliens were loaded into the trailer, including eight children and one pregnant woman.  To load the aliens, Zamorano positioned the rear of the trailer

adjacent to a small box truck so that the aliens could load directly into the trailer. This loading was captured on nearby security footage.

As the aliens were loaded into the trailer, which was not designed or suitable to transport humans, they were stripped of most of their belongings, including any cell phones. There were no safety restraints in the trailer, nor an ample supply of water. Seasoning was scattered heavily along the trailer floor in an effort to thwart law enforcement and their K-9s, which itched and burned the aliens' skin. The trailer doors were then locked from the outside, like the prior loads.

Mr. Zamorano then drove the trailer north along IH-35 to San Antonio, a trip which took him more than three hours according to the location data of his cell phone. During the transport, Mr. Zamorano became aware that the trailer's air conditioning unit was not working properly. He stopped to reset it at least one time and alerted other conspirators of this issue via phone.

As he neared San Antonio, the screams and pleas of the aliens could be heard by Mr. Zamorano in the tractor. Mr. Zamorano continued to drive the trailer all the way to the unloading location along Quintana Road in San Antonio where the tractor-trailer met waiting members of the organization.

There, they realized many of the aliens had died that

were in the trailer.  Mr. Zamorano's conduct was the but-for cause of the aliens' death and serious bodily injuries, and their injuries were serious -- and their deaths and serious bodily injuries were reasonably foreseeable to him.

Over the course of the conspiracy, the organization also employed other drivers besides Mr. Zamorano.  From November of 2021 through June 27th of 2022, the organization utilized the same process described above to transport at least 13 additional loads of aliens from Laredo to San Antonio.  Of those 13 loads, six were detected by law enforcement at U.S. Border Patrol checkpoints, resulting in the following findings by Border Patrol agents.

THE COURT:  And was this the same vehicle each time?

MR. FUCHS:  No, Your Honor.  Different tractor-trailers usually.  Sometimes they were reused.

THE COURT:  What does it say on the outside of the trailer?

MR. FUCHS:  Generally they were just painted a blank white paint.  No business name.

THE COURT:  Okay.  Go ahead.

MR. FUCHS:  Border Patrol agents, on November 4th of 2021, found 60 aliens secreted in the back of a trailer.  On December 1st of 2021, they found 63 aliens in the back of a tractor-trailer.  On February 8th of 2022, 78 aliens in the back of a tractor-trailer.  On March 30th of 2022, 107 aliens

in the back of a tractor-trailer.  On April 29th, 2022, 98 aliens in the back of a tractor-trailer.

THE COURT:  And was the defendant the driver in each time?

MR. FUCHS:  Not on those loads.  No, these were other loads run by the organization.

THE COURT:  Okay.  And these vehicles were stopped?

MR. FUCHS:  Yes.

THE COURT:  Okay.

MR. FUCHS:  Each of these six seizures were stopped by Border Patrol checkpoints.

THE COURT:  All right.

MR. FUCHS:  Drivers were arrested and aliens were seized.

THE COURT:  All right.  Good enough.

MR. FUCHS:  And ultimately on June 5th --

THE COURT:  All from the Laredo -- all coming from Laredo?

MR. FUCHS:  All proceeding in the exact same process that I've described, where the tractor-trailer would be --

THE COURT:  Okay.

MR. FUCHS:  -- start in San Antonio, driven by the driver down to Laredo, pick up the aliens, and then try to return to San Antonio.

THE COURT:  Okay.

MR. FUCHS: And then on June 15th of 2022, 71 aliens were found in the back of a tractor-trailer.

So ultimately Zamorano, Mr. Zamorano, we'd ask that he admit on the dates charged in the indictment, from June 20th to June of -- I'm sorry -- June of 2020 through June of 2022, he and others knowingly, in reckless disregard of the fact that aliens came to, entered, and remained in the United States in violation of law, did knowingly conspire and agree with each other to transport, move, and attempt to transport and move aliens within the United States, and the offense resulted in the death of 53 persons, and during and in relation to which the defendant caused serious bodily injury to or placed in jeopardy the life of 11 persons, in violations of the relevant statutes.

We also ask that Mr. Zamorano admit ultimately that at the beginning -- that beginning on or about June 25th of 2022 to June 27th, 2022, he and others, aided and abetted by each other, knowing and in reckless disregard of the fact that aliens came to, entered, and remained in the United States, in violation of law, did knowingly and intentionally transport, move, and attempt to transport and move said aliens within the United States by means of transportation or otherwise, and the offense resulted in the death of 53 persons, and during and in relation to which the defendant caused serious bodily injury to or placed in jeopardy the life of 11 persons.

THE COURT:  Okay.  If you and your client could come back up here.

EXAMINATION

BY THE COURT:

Q.  Let me ask the defendant.  Do you agree with the prosecutor's statement of facts?

A.  Yes, sir.

Q.  What he just read?

A.  Yes, sir.

Q.  And is this what you did?

A.  Yes, sir.

Q.  Okay.  And do you understand the nature of the charges against you?

A.  Yes, sir.

Q.  And do you understand that before you could be found guilty at trial, the government would be required to bring the witnesses and any other evidence they may have to establish your guilt beyond a reasonable doubt?

A.  Yes, sir.

Q.  Okay.  Do you have any questions concerning the charges or the factual basis?

A.  No, sir.

Q.  Okay.  Again, to Counts 1, 2, and 3 of the indictment, how do you plead, guilty or not guilty?

A.  Guilty, sir.

Q. And are you pleading guilty freely and voluntarily and with full knowledge of the consequences?

A. Freely pleading guilty.

Q. I'm sorry?

A. I'm pleading guilty.

Q. Okay. Has anyone threatened you, coerced you, or has anyone in any way forced you to plead guilty in this case?

A. No, sir.

Q. Okay. And has anyone made any promise that caused you to plead guilty?

A. No, sir.

Q. Okay. Do you have any questions about anything we've covered here today in your case?

A. No, sir.

Q. All right.

THE COURT: Then the Court finds defendant's plea is freely and voluntarily made. Defendant fully understands the nature of the charges and penalties. Defendant understands his constitutional and statutory rights and desires to waive them. Defendant is competent to stand and proceed to trial, and that there is a factual bases for the plea.

At this time, the Court does accept your guilty plea.

Let me ask the prosecutor. How many defendants were in this case?

MR. FUCHS: Seven in this indictment. There's one in

a separate indictment -- or actually two in separate indictments related.  So nine total.

THE COURT:  Of the seven, how many of those are going to trial?

MR. FUCHS:  Two.

THE COURT:  And all of the others have pled?

MR. FUCHS:  Yes, Your Honor.

THE COURT:  And what about the other indictment where there's two people?

MR. FUCHS:  Yeah.  One has pled guilty and one is en route from Guatemala.

THE COURT:  En route what?

MR. FUCHS:  He's being extradited.

THE COURT:  Okay.  All right.  So of the seven, five have pled.  And when is that trial set for?

MR. FUCHS:  March 3rd, Your Honor.

THE COURT:  March 3rd.  Okay.  And the trial will be how long?

MR. FUCHS:  Approximately four weeks.

THE COURT:  Okay.

All right.  Do we have a sentencing date, Natasha, on this case?

THE DEPUTY CLERK:  April 24th.

THE COURT:  April 24th.

Let me ask the defendant.  Do you have any questions

about anything that has occurred here today?

THE DEFENDANT: No, sir.

THE COURT: You understand you have pled guilty and your sentencing date is April 24th.

And, Counselor, does your client understand the guideline provision and what he is facing?

MR. GONZALEZ-FALLA: Yes, Your Honor.

THE COURT: Okay. As I have it here, Count 1, 2, and 3. On Count 1 and 2, it's 360 months to life. And on Count 3, 240 months' maximum time. Your client understands that?

MR. GONZALEZ-FALLA: Well, we've gone through the guidelines, Your Honor, and I don't know that I necessarily agree with what the Court's computation is.

THE COURT: No, I understand that. I know you're not going to agree. I just want to make sure your client understands that.

MR. GONZALEZ-FALLA: Yes, Your Honor.

THE COURT: In other words, he knows the penalties he's facing?

MR. GONZALEZ-FALLA: Absolutely, Judge.

THE COURT: Okay. Thank you.

Anything else, Counselor?

MR. GONZALEZ-FALLA: No, Your Honor.

THE COURT: Anything from the government?

MR. FUCHS: No, Your Honor.

THE COURT: All right. Thank you.

Let me ask, if you can say, if you can't then don't tell me. Are any of the persons who have already pled, might be some of your witnesses?

MR. FUCHS: Yes, Your Honor.

THE COURT: Okay. All right.

Thank you. You-all are excused.

*(Concludes proceedings)*

-oOo-

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter. I further certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.

Date: 12/05/25          /s/ *Gigi Simcox, RMR, CRR*
                        Court Reporter