UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ‖ | |
| Plaintiff, | ‖ | CRIM. NO. SA-22-CR-366 OLG |
| v. | ‖ | |
| HOMERO ZAMORANO, JR. (1), | ‖ | |
| Defendant. | ‖ | |

**GOVERNMENT'S SUPPLEMENTAL BRIEFING REGARDING
(1) THE PSR'S APPLICATION OF THE SPECIAL SKILL ENHANCEMENT,
(2) THE PSR'S CROSS-REFERENCE TO SECOND-DEGREE MURDER, &
(3) THE PSR'S DENIAL OF THE THIRD ACCEPTANCE POINT**

Defendant Homero Zamorano—who drove a tractor trailer loaded with undocumented migrants, 53 of whom died in the back after Zamorano refused to open the doors—is before the Court for sentencing. The Court requested additional briefing regarding: (1) the PSR's application of the special skill enhancement, (2) the PSR's cross-reference to second-degree murder, and (3) the PSR's denial of the third acceptance point.   All are properly applied, and the Government asks the Court to adopt the PSR without modification.

## I.   ANALYSIS

**A. The PSR's application of the special skill enhancement is correct because driving a commercial tractor-trailer requires special skill not everyone possesses and that skill was critical to the commission of this offense.**

Section 3B1.3 provides for a two-level upward adjustment if the defendant used a special skill in a manner that significantly facilitated the commission or concealment of the offense.   The commentary to 3B1.3 defines "special skill" as referring "to a skill not possessed by members of

1

the general public and usually requiring substantial education, training or licensing." *See* Note 4. Thus, to impose a special skill adjustment under 3B1.3, the court must find that the defendant: (1) possessed a special skill and (2) used that skill in a manner to significantly facilitate the commission or concealment of the offense. *See United States v. Willett*, 751 F.3d 335, 344 (5th Cir. 2014).

The Fifth Circuit has repeatedly upheld the application of the special skills enhancement for commercial truck drivers transporting aliens in commercial trailers. *See United States v. Villafranca*, 844 F.3d 199, 200 (5th Cir. 2016) (noting that possession of a commercial driver's license is shorthand for the knowledge and ability to drive a tractor trailer truck, which constitutes a special skill for purposes of 3B1.3); *United States v. Gill*, 642 Fed.Appx. 323, 326 (5th Cir. 2016) (explaining that the ability to drive a commercial vehicle with a trailer "gave the appearance that [Defendant] was hauling a legitimate load and made it much more difficult to identify the aliens"); *United States v. Gonzalez*, 627 Fed.Appx. 381, 382 (5th Cir. 2015) (determining that it took special skill to drive a commercial truck hauling two additional tractors, which [Defendant] would have been unable to do absent his commercial driver's license and his years of experience).

Zamorano's argument that his ability to drive a commercial vehicle is not a special skill because he did not have a valid Commercial Driver's License misconstrues the standard. Most members of the public cannot drive tractor trailers. And though tractor-trailer drivers are required by law to possess a valid CDL, that is not a prerequisite to possessing the skill to do all that is necessary to physically drive one.

The skill required to drive a commercial truck is not something most people can do and requires specialized expertise independent of possessing a CDL. Zamorano, for example, drove a tractor-trailer from San Antonio to Laredo, which necessitated countless changing of gears, speeds, exits, turns and stops, all while hauling a 53-foot trailer and navigating traffic for more

than two hours on an interstate highway. Once in Laredo, the organization's load-up location required Zamorano to back up the tractor-trailer to directly meet a white box truck trailer along a narrow road—and to do so without arousing suspicion—so that the aliens could load directly into the tractor trailer without being detected. PSR ¶ 14. This maneuver required skill and experience, not just anyone could perform such a task.



Surveillance photo of Zamorano driving the tractor-trailer toward the load-up location prior to backing up against the white box truck on June 27, 2022.

After loading up the aliens, Zamorano then had to repeat the lengthy drive north along IH-35, with the added hurdle of now navigating one of the busiest Border Patrol Checkpoints in the nation—Checkpoint C-29 outside of Laredo. At C-29, personal and commercial vehicles are separated into different lanes for search purposes.



Charlie 29 Checkpoint on IH-35 showing division of commercial and personal vehicles (Government Exhibit 332).

Because Zamorano's special skill enabled him to drive a commercial vehicle, he drove the tractor trailer through the commercial lanes with dozens of aliens secreted in the back, unlike in a passenger vehicle where they would have been visible and where he would not have been able to transport nearly as many. This skill also allowed him to pose as a legitimate commercial truck driver with legitimate cargo. He was even in possession of a seemingly legitimate Bill of Lading, something only a commercial driver would possess.



Homero Zamorano passing through the C-29 Checkpoint on June 27, 2022 (Government Exhibit 206-A).



Bill of Lading possessed by Homero Zamorano on June 27, 2022 (Government Exhibit 1011-B).

This organization's business model and success also recognized the skill required to drive a commercial truck—the ability to drive a tractor trailer was a prerequisite during recruitment because the organization utilized tractor-trailers to secretly transport large loads of aliens from the border, past Border Patrol checkpoints, to San Antonio.   If you could not drive a tractor-trailer, you could not serve as a load driver for this organization.[1]   The use of skilled commercial drivers permitted the organization's trucks to blend in with legitimate commercial truck drivers carrying legitimate cargo along one of the busiest commercial routes in the country.   PSR ¶ 7.   And that tactic enabled the organization to repeatedly smuggle migrants past Border Patrol checkpoints, with at least 10 successful trips in the eight months leading up to the fatal venture.   This special skill allowed the organization to transport more aliens, take on less risk (because fewer loads were needed compared to using private vehicles), and increase profitability.

---

[1] The Court will recall from testimony during the trial of the co-defendants one failed venture: On that occasion, the organization recruited someone who they thought could drive tractor-trailers, only to have to abandon a smuggling venture (and the tractor-trailer on the side of the road in San Antonio) when they realized the person was not skilled enough to maneuver the tractor-trailer to Laredo and back.

Zamorano's special skill as a commercial truck driver thus enabled him to facilitate the commission of the offense in a way necessary for the offense to be committed. No CDL was required. Instead, through gained experience, he was skilled in doing something most cannot— driving a large commercial vehicle on major highways, precisely backing it up to a box truck, and surreptitiously driving through Border Patrol checkpoints, blending in with legitimate truck drivers with legitimate cargo. The special skill enhancement is thus properly applied because he utilized his special skill in driving a tractor trailer to facilitate the commission of this offense.

### B. The PSR's cross-reference to second-degree murder is correct because Zamorano acted with extreme recklessness and wanton disregard for human life.

When an alien transportation offense results in death, a sentencing court must "apply the appropriate homicide guideline from Chapter Two, Part A, Subpart 1, if the resulting offense level is greater than that determined under this guideline." U.S.S.G. § 2L1.1(c)(1).

"Under federal law, the distinction between second-degree murder and involuntary manslaughter turns on whether the defendant committed the killing with 'malice' or with a reduced level of culpability." *United States v. Hicks*, 389 F.3d 514, 530 (5th Cir. 2004). For second-degree murder, "malice aforethought" entails three distinct mental states: (1) intent to kill; (2) intent to do serious bodily injury; and (3) *extreme recklessness and wanton disregard for human life* (depraved heart)." *United States v. Lemus-Gonzalez*, 563 F.3d 88, 92 (5th Cir. 2009) (quotation marks omitted; emphasis added). In contrast, involuntary manslaughter merely requires that the defendant "(1) acted with gross negligence, meaning a wanton or reckless disregard for human life, and (2) had knowledge that his or her conduct was a threat to the life of another or knowledge of such circumstances as could reasonably have enabled the defendant to foresee the peril to which his or her act might subject another." *Id.* (quotation marks and alterations omitted). Therefore, under federal law, the difference between second degree murder and involuntary manslaughter is

*extreme* conduct by the defendant.   Second-degree murder requires extreme recklessness and wanton disregard for human life, while involuntary manslaughter requires recklessness and wanton disregard not otherwise extreme.   The ultimate question facing this Court, therefore, is whether Zamorano's recklessness and wanton disregard for human life can be described as extreme.   In deciding if a defendant's actions are extreme, the Court can consider what the defendant knew at the time.   *United States v. Escobedo-Moreno*, 781 Fed.Appx. 312, 316 (5th Cir. 2019).

Several 5th Circuit cases have affirmed the second-degree cross-reference and found a defendant acted with extreme recklessness and wanton disregard for human life in the alien smuggling context.   *See Lemus-Gonzalez* 563 F.3d at 92 (defendant was drunk and fled from authorities while driving a van overloaded with unsecured passengers, ending in a fatal crash); *Escobedo-Moreno*, 781 Fed.Appx. at 316 (defendant left an alien trapped inside a metal box contained within an impounded tractor trailer sitting outside in the South Texas heat).

Like the cases above, Zamorano acted in extreme recklessness and wanton disregard for human life by transporting aliens in a locked trailer in the middle of a south Texas summer. Along the way, his conduct became even more extreme as he gained additional knowledge of the events unfolding behind him.   First, while driving north from Laredo to San Antonio, Zamorano heard the victims screaming and banging on the walls for help.   PSR ¶ 17.   In response to their cries, he got out of the tractor on at least three occasions and tried to reset the refrigeration unit.   PSR ¶ 18.   But he never attempted to open the locked trailer doors.   He didn't call 911.   He didn't flag down help.   Instead, Zamorano, from the outside of the trailer, yelled at the aliens and told them they were "almost there."   Thus, despite Zamorano gaining knowledge of the unfolding dire situation while he drove, he did nothing.   As the only person on scene who could have assisted, he did not.   His extreme recklessness and wanton disregard for the migrants' lives supports the PSR's cross-reference to second-degree murder.

**C. The Government's reason for declining to move for the third-level reduction is appropriate.**

U.S.S.G. § 3E1.1(b) provides that the offense level may be reduced an additional level if the Government moves for such a reduction and represents that the defendant:

> "has assisted authorities in the investigation or prosecution of his own misconduct by *timely notifying authorities of his intention to enter a plea of guilty*, thereby *permitting the government to avoid preparing for trial* and permitting the government and the court to allocate their resources efficiently."

U.S.S.G. § 3E1.1(b) (emphasis added). A defendant who enters a guilty plea is *not* entitled to an adjustment under U.S.S.G. § 3E1.1 *as a matter of right*; evidence may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility. *See* U.S.S.G. § 3E1.1 cmt.n.3. (emphasis added).

Because the Government is in the best position to determine whether the defendant has assisted authorities in a manner that avoids preparing for trial, an adjustment under subsection (b) may *only* be granted upon a formal motion by the Government at time of sentencing. *See* U.S.S.G § 3E1.1 cmt.n.6 (emphasis added). The Government has wide discretion with respect to filing a § 3E1.1(b) motion. *See United States v. Newson*, 515 F.3d 374, 378 (5th Cir. 2008). The point of a § 3E1.1(b) motion is to reward defendants who notify authorities early enough so that the Government may avoid preparing for trial and the court may schedule its calendar efficiently. *See United States v. Williamson*, 598 F.3d 227, 231 (5th Cir. 2010). A defendant is entitled to the additional reduction for pleading guilty only if the two goals of § 3E1.1(b)(2) are fulfilled: "(1) the government avoids needless trial preparation, and (2) the court is able to allocate its resources efficiently." *United States v. Williams*, 74 F.3d 654, 656 (5th Cir. 1996) (citations omitted). If the government relies on interests identified in USSG § 3E1.1, the court may not overrule the government's refusal to file a motion for the third-level reduction unless the government acts pursuant to an unconstitutional motive. *See U.S. v. Halverson*, 897 F.3d 645

(5th Cir. 2018).

Because the Government has not—and will not—move for the third point in this case, the PSR properly reflect that denial.   Zamorano's untimely plea of guilt caused the Government to exert a considerable amount of time and effort into unnecessary trial preparation.   And he did so knowingly.   To utilize resources efficiently and transparently, the Government filed a motion on February 27, 2024—more than 20 months after Defendant was arrested—warning Zamorano in writing that if he were to plead guilty after his *Lafle*r hearing, the Government would not move for the third level of acceptance.   ECF Doc. 215 (Government's Lafler Mtn).   This was done because the Government was aware of the vast amount of preparation that would be necessary to prepare for trial and did not want to allocate its resources needlessly.   Thirteen days later, on March 11, 2024, the Court held the *Lafler* hearing, and Zamorano insisted he wanted to proceed to trial.   ECF No. 228.   Zamorano's trial was specially set for October 21, 2024.   ECF No. 219.

Based upon Zamorano's representation, the Government over the next seven months spent well over 1,000 collective hours preparing for trial, including, but not limited to:

- Presenting a Third Superseding Indictment to the Grand Jury (ECF Doc. 256)
- Filing a Motion for Pretrial Scheduling Order Regarding Transcripts & Translations (ECF Doc. 267)
- Preparing translations and transcripts of text message and WhatsApp conversations the Government intended to introduce at trial.
- Reviewing objections and proposed objections Zamorano's counsel made to the Government's translations and transcripts and reaching an agreement as to their accuracy for trial. (See ECF Doc. 280).
- Filing a Second Notice Bill of Particulars (ECF No. 291)
- Filing an Amended Second Notice Bill of Particulars (ECF No. 295)
- Filing an Advisory to the Court Regarding Forfeiture (ECF Doc. 301)
- Filing a Motion in *Limine* (ECF Doc. 321)
- Meeting with SAPD officers to discuss testimony regarding Zamorano
- Meeting with Border Patrol Agents, who drove from Laredo to San Antonio, for trial preparation

- Meeting with HSI Agents to discuss testimony regarding Zamorano
- Meeting with surviving victims, who flew to San Antonio from all over the country, to discuss their trial testimony
- Meeting with civilian witnesses, who took time off of work
- Organizing and preparing more than 700 exhibits

Throughout all the Government's preparation, Zamorano gave no indication he would plead guilty. It was only at the pre-trial conference on October 3, 2024—two weeks before the scheduled special trial setting—that Zamorano notified the Government and the Court of his change in posture. Given that this change in plea took place seven months after Zamorano affirmed his intent to proceed to trial, and after the government expended significant time and resources preparing for that trial, withholding this third acceptance point is warranted. *See* U.S.S.G § 3E1.1.

## II. CONCLUSION

Because the PSR correctly applies the special skill enhancement and the cross-reference to second-degree murder in its guideline calculation and properly does not credit Defendant with the third level of acceptance, the Government asks the Court to adopt the PSR in its current state.

JUSTIN R. SIMMONS
UNITED STATES ATTORNEY


_____/s/_____

SARAH SPEARS
Assistant United States Attorney
Texas State Bar No. 24117197
601 NW Loop 410, Suite 600
San Antonio, Texas 78216


_____/s/_____

ERIC J. FUCHS
Assistant United States Attorney
Texas Bar No. 24059785
601 NW Loop 410, Suite 600
San Antonio, Texas 78216
(210) 384-7445


CERTIFICATE OF SERVICE

I hereby certify that on April 3, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the parties of record.


_____/s/_____

SARAH SPEARS
Assistant United States Attorney

11